[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff wife commenced this action for a dissolution of marriage on the ground of its irretrievable breakdown, by complaint returnable March 2, 1993. She also sought alimony, a fair and equitable settlement and other relief, as on file. The defendant husband appeared by counsel, but filed no answer or cross complaint, and the case was claimed to the limited contested list. Both parties were represented by counsel at the trial and submitted financial affidavits. The plaintiff submitted written proposed orders and claims for relief. Each party testified and a number of documentary materials, including real estate appraisal reports, were introduced into evidence. The husband's mother and secretary-assistant CT Page 5340 also testified. The taking of evidence was completed, and the parties waived oral argument and the filing of briefs.
From the evidence, the court finds as follows: the plaintiff, whose maiden name was Nancy C. Vertefeuille, married the defendant husband at Willimantic, Connecticut, December 11, 1965. The wife has been a resident of this state for at least one year before the date of the complaint. All statutory stays have expired, and the court has jurisdiction.
The parties have no minor children issue of their marriage, and none were born to the wife since the date of the parties' marriage. They have two sons, issue of the marriage, who have reached their majority. They now reside with the wife in a one-bedroom apartment.
Neither party is a recipient of public assistance.
The husband is 48 years of age, completed high school, has a bachelor's degree in engineering and graduate credits toward a master's degree. He had been employed as an engineer for many years for Silgan Plastics Corp. until his layoff about one year ago. He is now self-employed as an engineer and is the sole proprietor of J. C. Engineering and Project Management. When he left Silgan, he took with him several projects. He claims on his financial affidavit that he has a gross weekly income of $238 and a net of $162.[1] The defendant also manages, maintains and rents several real estate properties which are jointly owned by the parties.[2] He has a heart condition, involving a defective valve and enlarged heart, which does not impair his job performance or otherwise affect his daily activities. He takes no medication.
The wife is 47 years of age and in good health. She is a high school graduate by GED and has taken college courses. She suffers from stress and experienced a premature change of life for which she receives hormonal therapy. She has been under psychiatric care. She worked for Delta Rubber Company for about four years, first as a production line worker, then as a supervisor. She has worked for Wyman-Gordon Co. (and its predecessor) as a machine operator for about fifteen (15) years. She has worked outside the family home throughout the marriage, except for a three-year period encompassing the birth of the parties' two sons. She earns $449 per week gross and $295 per week net when her 401K deduction is added back. She has also CT Page 5341 worked second, part-time jobs, as a hostess in a restaurant and a cashier in a supermarket.
This marriage of more than twenty-eight (28) years was discordant for most of its duration. Both spouses engaged in activities which were destructive of the other and the marriage. Without going into further detail, their behavior included acts of infidelity and adultery, verbal and physical abuse, possible child abuse, etc. They failed to communicate with each other and strongly disagreed on the manner of rearing and disciplining their two sons. There were threats. On one occasion, they were both arrested. The wife trashed the husband's home office. The parties separated in May, 1993, after the institution of this action. Both sons were involved in criminal arrests and each left the family home, the younger at age 17. The household was clearly dysfunctional, and the parties' actions did nothing to ameliorate matters.
On the state of this evidence, it is clear that the marriage has irretrievably broken down; however, the court cannot attribute the greater share of the responsibility and blame for that breakdown to either party.
The parties have acquired substantial assets during their marriage. These include the jointly-owned family home located at Route 184, Stonington, Connecticut, which has a value of $188,000, less a mortgage of $130,000, and an equity of $58,000. The husband has been residing there since the parties' separation and conducts his engineering business in the basement where he has a workshop, with several large machine tools, a computer, printer and fax machine. This house was acquired with the use of the sale proceeds from the parties' jointly-owned Sterling house. That house was acquired from the joint savings of the parties and a mortgage. The parties both worked on the renovation and improvement of the Stonington home, including the adding of a garage, finishing the kitchen and upstairs bedrooms, landscaping, and the like.
The Stonington property was refinanced in 1992 and a $135,000 mortgage was placed on it, which was allocated for accounting purposes by the defendant to it and the rental properties hereinafter mentioned.
There are two adjoining properties in Jewett City, Connecticut, 61-63 Mathewson Street, a two-family dwelling worth CT Page 5342 $75,000 and 65 Mathewson Street, Jewett City a four-family dwelling, worth $105,000.[3] Both properties are mortgage free and have been and are now actively rented to tenants. For a number of reasons related to easements and parking, it would be impractical and inappropriate to divide the ownership.
The two properties were originally acquired in 1985 and 1984, respectively, by the parties in a partnership, with the couple owning a one-half interest, and a third party Hoagland, owning the other one-half interest. Both spouses spent much effort and time renovating the properties, with the wife painting and the husband doing carpentry, electrical and other work. Later, the couple bought out their partner's share, using some $41,000 in funds put aside for their sons' college education. Title to the properties may still be in the partnership name. See note 2, supra.
Another property jointly owned is a single-family dwelling known as 93 Meadowbrook Lane, Mansfield, Connecticut, which is worth $76,000 and is mortgage free. This was purchased for $5,000 from the husband's grandmother, a price about $10,000 below market value. It also was their first real home after spending the first three years of their marriage living in a trailer. This property was mortgaged to buy the Sterling home above mentioned, and is now rented.
The parties also have a mobile home valued by the husband at $500; the wife values it at $5,000. No appraisals were furnished as to this asset, and although the mobile home is old and is situated on another's land, it brings in about $500 per month rent. The court, under these circumstances, believes the $5,000 value more credible. This finding is corroborated by the defendant's 1992 valuation of this item at $4,000 in Plaintiff's Exhibit A.
The husband has a Monsanto Savings Investment Plan (SIP) worth $62,047, a Silgan 401K plan worth $44,872, and his retirement plan valued at $50,554. The wife has her Wyman-Gordon 401K plan worth $1,728 and her pension worth $5,435. All of these were acquired during the marriage.
The parties each have an automobile for daily, regular use. The husband also has a 1978 Corvette worth $5,000 and a 20' boat worth $5,500. CT Page 5343
These assets total $494,136, not including their household furnishings, personal items and everyday cars. The wife also cashed in an IRA account worth several thousand dollars and used some of the proceeds for her attorney's fees.
Against these assets, excluding the home mortgage and the parties' respective car loans, they report liabilities on Schedule 3 of their financial affidavits as follows: The husband, $15,981, which includes $1,650 in fees due to his prior attorney; the wife, $20,444, which includes $6,074 in fees to her attorney, and the remainder for credit card obligations.
The husband earned $919 per week in his Silgan job at about the time of his layoff. The parties commingled their incomes during the marriage and used the funds for family and household purposes. It is evident that the husband's earnings throughout the marriage were greater than that of the wife, although she sometimes worked a second, and once, even a third job. From this evidence, the court concludes that the husband's monetary contributions to the acquisition, preservation and appreciation in value of the marital assets were greater than those of the wife.
The wife was the primary caretaker of the parties' children during the first three years after their birth. The wife was also the homemaker and cook. Her non-monetary contributions to the marriage were greater than those of the husband.
The court also concludes from the evidence that while the parties have equal employability, the husband has greater vocational skills and earning capacity than the wife, and he has a far greater opportunity than she has to acquire capital assets and income in the future.
It is significant to none that the husband's financial affidavit reports no value for his engineering business or its equipment. He also reports weekly gross income of $238; and a weekly net of $162, while at the same time, he pays his engineering assistant-secretary $200 per week. No verification was provided or demanded as to his gross business income and expenses or of the values of the outstanding contracts or jobs he currently works on. Also, he reports $759 per week gross income from the four rental properties (61-63 Mathewson Street; 65 Mathewson Street; 93 Meadowbrook; and the mobile home) and CT Page 5344 $746 per week in expenses, for a net income of $13 per week. Again, no breakdown of the rental income and expenses attributable to these properties was provided. Moreover, although the court recognizes that applications to banks for loans may contain optimistic financial statements, the court notes that Plaintiff's Exhibit A (the parties' loan application dated September 4, 1992) reported $2,367 per month as net rental income from the four properties, while Defendant's Exhibit 4 shows a $377 loss for 1992. Exhibit A was in fact prepared by the defendant, and although the court understands the defendant's explanation of allocation of debt service of the home mortgage among the family home and the rental real estate, such allocation cannot, without further verification, account for the discrepancy between the defendant's assertion of $2,367[4] net monthly rental income and the net annual loss of $377 as shown by Exhibit 4. This inconsistency casts grave doubt on his financial affidavit which reports a current net income from rents of $676 per year on gross rents from all of the properties, which total about $39,500 per annum.
In considering the appropriate assignment of the various assets of the parties, it is also important to note that if the Jewett City properties were to be sold, a substantial capital gains tax liability would result, approximately $35,000. Also, it must be noted that the defendant's deferred compensation and retirement funds,[5] which total $157,473, would be subject to ordinary income taxation and penalties upon withdrawal.
The court has considered all of the evidence and its findings in the light of the criteria in General Statutes § 46b-81 and § 46b-82, and has also considered the income tax implications and consequences of its orders relating to property distribution and alimony, and orders:
(1) A decree dissolving the marriage shall enter on the ground of irretrievable breakdown.
(2) The plaintiff shall transfer by quit claim deed to the defendant all of her right, title and interest in and to the following properties: the family dwelling known as Route 184, Stonington, Connecticut; 61-63 Mathewson Street and 65 Mathewson Street, Jewett City, Connecticut; 93 Meadowbrook Lane, Mansfield, Connecticut; and, the mobile home. The defendant shall pay all encumbrances thereon and save her harmless CT Page 5345 therefrom.
(3) The defendant shall execute and deliver to the plaintiff, as a property settlement, a promissory note and mortgage in the amount of $150,500. The principal balance of said note shall be payable with four (4%) percent interest per annum in equal monthly payments of $910 per month commencing June 15, 1994 hereof, with a balloon payment of all unpaid principal and interest, if not sooner paid, due and payable July 1, 1999. Said mortgage shall be a second mortgage on the Stonington property, and a first mortgage on the Mansfield and two Jewett City properties. Said note and mortgages shall provide for a default period of thirty (30) days for any instalment payment and for a default in the event defendant fails to pay the prior mortgage or real estate taxes, for attorney's fees and an increase in the interest rate to eight (8%) percent per annum in the event of default, and require the defendant to maintain appropriate property casualty insurance naming the plaintiff as mortgagee loss payee, as her interests appear. Said note and mortgage shall also provide for acceleration of maturity in the event of the defendant's death or sale of any parcel, provided, that the defendant shall be entitled to a partial release of any parcel upon a good faith sale or refinance provided that he is not then in default of his obligation hereunder, and provided further that he pay the plaintiff a sum equal to one-half of the proceeds of such sale or refinance or a fraction of the then unpaid principal balance of said mortgage, whichever is greater. The numerator of said fraction shall be the number 1; the denominator shall be the number of properties which remain secured by the mortgage after
such partial release. Any such payments shall be applied to unpaid principal balance of the note and not operate to reduce the regular monthly payments.
(4) The following shall vest in the plaintiff by Qualified Domestic Relations Order (QDRO): one-half of his Monsanto SIP; $21,572 from his Silgan 401K plan and $22,559 from his Silgan retirement plan. The wife shall take and have her Wyman-Gordon 401K and pension plans free of any claim of the husband. It is the intent of this order that the parties' assets as shown on Schedule 4G of their financial affidavits valued as of May 13, 1994 be divided between them equally, and the defendant shall cooperate in carrying out these transfers.
(5) The defendant shall pay to the plaintiff as CT Page 5346 periodic alimony the sum of $75 per week. Said periodic alimony shall terminate upon the death of either party, the plaintiff's remarriage, pursuant to the provisions of General Statutes § 46b-86(b), or December 19, 2008, whichever first occurs.
(6) The defendant shall take, own and have the following items of personal property: his bank accounts, the 1985 Century boat; the mobile home; his tools; the household furniture and contents in the Stonington house (except as hereinafter set out); his 1988 Ford and 1978 Chevrolet automobiles; and the remainder of the Schedule 4G assets reported on his financial affidavit. He shall also take, have and own all right, title and interest to his business, J.C. Engineering and Project Management, including good will, inventory, equipment and accounts receivable. In the event the wife is a signatory to his auto loan, he shall indemnify and save her harmless therefrom.
(7) The plaintiff shall take, have and own the following items of personal property: her 1991 Ford automobile; the personal property now in her possession; her 10-speed bike, the microwave; her Chinese dishes; her dining room curtains; and the washer and dryer; as listed on Schedule A attached to her proposed orders. The defendant shall either give her the kitchen set of a table and chairs or the sum of $750, at his choice. In the event the husband is a signatory to the wife's auto loan, she shall indemnify and save him harmless.
(8) Each party shall be solely liable for the obligations shown on Schedule 3 of their respective financial affidavits and save the other harmless therefrom.
(9) No attorney's fees are awarded to either party.
(10) The court shall retain jurisdiction over the QDROs to ensure compliance with applicable law.
(11) All documents and instruments of title necessary or incidental to the effectuation of the orders entered herein, and transfers of property shall be completed and exchanged within thirty (30) days hereof. In the event title to any property is in a partnership name, the parties shall execute and deliver, or cause to be executed, such documents as are necessary to carry out these orders. CT Page 5347
Teller, J.